STATE *ex rel.* R. S.

*v.*

GEORGE TRENT, *Supt.*, *WVISB, et al.*

(No. 15444)

Decided March 12, 1982.

*Charles R. Garten, Jr., and* Paul Mones for relator.

*Chauncey H. Browning,* Attorney General, and *Janet Frye Steele,* Assistant Attorney General, for respondents.

McGRAW, JUSTICE:

The petitioner, a sixteen-year-old male currently incarcerated in the West Virginia Industrial School for Boys, seeks a writ of habeas corpus to compel his release from the institution and a writ of mandamus to compel the committing court to place him in an appropriate residential treatment facility to meet his individual rehabilitative needs. He contends that his incarceration is illegal in that: (1) the committing court failed to receive him into its custody upon the recommendation of the Superintendent

of the Industrial School; (2) he has demonstrated a history of mental illness; and (3) he was not accorded the least restrictive dispositional alternative. The petitioner also contends that he is entitled to receive individual treatment consistent with his theraputic needs. We find merit in the petitioner's contentions and we grant the writ of mandamus prayed for. The writ of habeas corpus is conditionally awarded.

The petitioner has a history of delinquent and maladaptive behavior since the age of eight. He was expelled from school in the third grade and never returned. He has a history of severe drug and alcohol abuse since the age of eleven and may have been the subject of child abuse. He has been charged with numerous instances of breaking and entering, destruction of property, shoplifting and auto theft and has spent a good deal, if not the majority, of his youth in mental health facilities, detention centers and correctional institutions. Periodic psychological evaluations of the petitioner have led to diagnoses that he suffers from organic brain syndrome with behavioral reaction, emerging antisocial personality disturbance, borderline mental retardation and possible learning disabilities, all generally characterized as being within the mild to moderate range of impairment. Prognoses vary from below average to poor.

On April 21, 1980, the petitioner was committed to the Industrial School for Boys by the Circuit Court of Ohio County, after being adjudged delinquent on a charge of breaking and entering. He remained incarcerated there until April 7, 1981, at which time he was released from custody upon the recommendation of the Superintendent of the Industrial School, who had determined that continued incarceration of the petitioner at the school would be of no benefit to him. The petitioner was released into the custody of his mother but was placed with an aunt until his mother could move into a mobile home. On April 10, 1981, the petitioner was arrested for stealing a car and was incarcerated in the Ohio County Jail until April 12, 1981. On April 15, 1981, he was again arrested and incarcerated for the theft of a motor home.

Upon motion of counsel for the petitioner, the circuit court ordered that the petitioner undergo psychological testing and evaluation. The tests were conducted from April 29, 1981 to May 4, 1981. On May 8, 1981, the petitioner was adjudged delinquent and was committed to the Industrial School for Boys for a term of not less than six months nor more than one year. On August 19, 1981, the Superintendent of the Industrial School, respondent herein, wrote a letter to the committing court recommending that the petitioner be returned to the custody of the court and that the Department of Welfare be directed to locate immediately an alternative facility for disposition of the petitioner. The Superintendent's stated reason for this recommendation was that incarceration of the petitioner at the Industrial School would not achieve his rehabilitation and was not in the petitioner's best interests. On August 26, 1981, Judge George Spillers of the First Judicial Circuit wrote a letter to Mr. Ronald Klug, the Supervisor of the Department of Welfare in Ohio County, directing him to implement the recommendations of Superintendent Trent. On November 5, 1981, Superintendent Trent wrote another letter to the circuit court indicating that he had received no response to his previous letter of August 19, 1981.

On December 1, 1981, Superintendent Trent again wrote to the committing court stating that the petitioner's placement at the school was not effective and again recommended that the petitioner be returned to the custody of the court for placement in an alternative facility. The Superintendent also suggested two out-of-state facilities which might be suited to the petitioner's needs. The petition in this case was filed on December 14, 1981.

The petitioner contends that his continued incarceration at the Industrial School following the Superintendent's recommendation that he be discharged into the custody of the committing court was illegal in that the committing court was required by law to comply with the Superintendent's recommendation. The petitioner also contends that his commitment was illegal in the first

instance because the circuit court did not afford him the least restrictive dispositional alternative available which was consistent with the purpose of his custody and because he had made a showing of mental illness. Finally, the petitioner asserts that not only is his present incarceration unlawful for the above-stated reasons, but that he is entitled to receive individual treatment consistent with his theraputic needs. On this ground the petitioner demands a writ of mandamus.

## I.

We turn first to the petitioner's contention that his commitment to the Industrial School by the circuit court on May 8, 1981, was unlawful in the first instance. W. Va. Code § 49-5-13(b) (1980 Replacement Vol.) requires the juvenile court at the dispositional stage of delinquency proceedings to "give precedence to the least restrictive" of the enumerated dispositional alternatives "consistent with the best interests and welfare of the public and the child." *See State ex rel. C.A.H. v. Strickler*, 162 W. Va. 535, 251 S.E.2d 222 (1979). Moreover, juveniles are constitutionally entitled to the least restrictive treatment that is consistent with the purpose of their custody. *State ex rel. K.W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907 (1978). A juvenile against whom delinquency proceedings are brought as the result of the child's commission of an act which would be a crime if committed by an adult may be committed to an industrial home or correctional facility "[u]pon a finding that no less restrictive alternative would accomplish the requisite rehabilitation of the child . . . ." W. Va. Code § 49-5-13(b)(5); *State ex rel. S.J.C. v. Fox*, 165 W.Va. 314, 268 S.E.2d 56 (1980).

In *State ex rel. D.D.H. v. Dostert*, 165 W.Va. 448, 269 S.E.2d 401 (1980), however, we held that a court having jurisdiction of juvenile proceedings "cannot justify incarceration in a secure, prison-like facility on the grounds of rehabilitation alone." Syl. pt. 5, in part. Rather the court's decision to commit the juvenile to an industrial school or correctional facility must be grounded on a number of factors indicating that incarceration is the appropriate disposition.

In this regard the court should specifically address the following: (1) the danger which the child poses to society; (2) all other less restrictive alternatives which have been tried either by the court or by other agencies to whom the child was previously directed to avoid formal juvenile proceedings; (3) the child's background with particular regard to whether there are pre-determining factors such as acute poverty, parental abuse, learning disabilities, physical impairments, or any other discrete, causative factors which can be corrected by the State. or other social service agencies in an environment less restrictive than an industrial school; (4) whether the child is amenable to rehabilitation outside an industrial school, and if not, why not; (5) whether the dual goals of deterrence and juvenile responsibility can be achieved in some setting less restrictive than an industrial school and if not, why not; (6) whether the child is suffering from no recognizable, treatable determining force and therefore is entitled to punishment; (7) whether the child appears willing to cooperate with the suggested program of rehabiltiation; and (8) whether the child is so uncooperative or so ungovernable that no program of rehabilitation will be successful without the coercion inherent in a secure facility.

*Id.* Syl. pt. 4, in part.

Before ordering the incarceration of the child, the juvenile court is required to set forth upon the record the facts which lead to the conclusion that no less restrictive alternative is appropriate. The record must affirmatively show

that the child's behavioral problem is not the result of social conditions beyond the child's control, but rather of an intentional failure on the part of the child to conform his actions to the law, or that the child will be dangerous if any other disposition is used, or that the child will not cooperate with any rehabilitative program absent physical restraint. *Id.* at 413-414.

Upon reviewing the circuit court's order committing the petitioner to the Industrial School, we find that the court made the following "specific findings":

1. Every reasonable alternative with regard to placement has been explored.

2. Due to his continuous violent and destructive behavior, [the petitioner] presents a danger to himself and to others.

3. There is at this time no less restrictive alternative availabe or appropriate for [the petitioner] than placement into the custody of the Commissioner of Institutions of West Virginia, for placement at the Industrial School for Boys.

The circuit court made no recitation of facts to support the findings. There is no mention of the alternatives explored by the court and the reasons for their rejection. There is no indication of other less restrictive disposition alternatives already tried by the court or by social service agencies. There are no factual findings with regard to the extensive psychiatric and psychological evaluations of the petitioner nor any mention of the results of the court-ordered psychological examination of the petitioner which was conducted shortly before the dispositional hearing. The circuit court did not make a sufficient record in light of the guidelines set forth in *State ex rel. D.D.H. v. Dostert, supra,* which would enable this Court to review the reasons for the circuit court's determination that the petitioner's rehabilitation could be accomplished by no less restrictive alternative than incarceration at the Industrial School.

The other exhibits presented by the petitioner and the respondents, which should have been before the circuit court at the time of the dispositional hearing,* reveal facts that might support the circuit court's conclusions.

---

* W. Va. Code § 49-7-23 (1980 Replacement Vol.) requires the Department of Welfare to file of record and preserve "[t]he proceedings, records, reports, case histories, and all other papers or documents of or received by the State department in the administration of" Chapter 49.

The psychiatric evaluations of the petitioner over a period of three years indicated that he required a structured, secure enviornment where he could be taught forced acceptance of responsibility in order to conform his behavior to the law. The staff psychologists at the mental health facilities where the petitioner was hospitalized were of the opinion that hospitalization at those facilities was not conducive to the petitioner's rehabilitation. The petitioner's repeated delinquent behavior was indicative of the fact that past rehabilitative efforts had proved unsuccessful. On at least one occasion the petitioner had run away from the facility to which he had been committed and had committed a delinquent act.

The circuit court made no mention of these factors in its dispositional order, however. Moreover, it is uncontested that the petitioner had been incarcerated on a prior occasion at the Industrial School and had been released upon the assertion of the Superintendent that that facility was unable to fulfill the petitioner's rehabilitative needs. Since we have no record which would enable us to determine the factors that led to the conclusion that incarceration was the least restrictive appropriate alternative and to decide whether that conclusion was justified, we award a writ of habeas corpus in accordance with our decision in *State ex rel. D.D.H. v. Dostert, supra,* and order the petitioner discharged from the custody of the Superintendent of the Industrial School.

The petitioner also contends that his incarceration was unlawful in the first instance in that he had demonstrated a history of mental illness. W. Va. Code § 28-1-2(c) (1981 Cum. Supp.) provides in pertinent part, "[n]o youth who is mentally ill or significantly mentally retarded shall be committed to, or retained by, the commissioner of corrections, but shall be returned to the committing court for further disposition . . . ." "Mental illness" is defined, for purposes of Chapter 27, as "a manifestation in a person of significantly impaired capacity to maintain acceptable levels of functioning in the areas of intellect, emotion and physical well-being." W. Va. Code § 27-1-2 (1980 Replacement Vol.).

Prior to the dispositional hearing the circuit court, upon request of the petitioner's counsel, ordered psychological examinations of the petitioner. The examinations occurred over a period of four days and consisted of psychological testing, interviews and observation of the petitioner by psychologists in private practice. The report of the results of the examination traced the petitioner's medical history and his background. The report concluded that the petitioner suffered from learning disabilities, a memory dysfunction and mental retardation in the mild to moderate range of impairment. The petitioner was also diagnosed as suffering from an organic brain disorder related to epilepsy which resulted in explosive behavior, but it appeared that drug treatment was successful in containing the petitioner's seizures. The report concluded that the petitioner's behavioral problems were more the result of an "antisocial personality disorder" than of "mental illness" or "organic disorders" and that the petitioner did not exhibit psychotic or neurotic behavior. The petitioner was found to be capable of understanding the proceedings against him and competent in assisting in his own defense. To this extent the court-ordered evaluation of the petitioner was in accord with prior evaluations of the petitioner's conduct. Earlier examinations, however, had also indicated that the petitioner tended to act to satisfy his immediate desires without reflection upon the inappropriateness of consequences of his behavior, and that he manifested hostility and suspicion of others and that he tended to respond to stressful situations with anger, lack of control and violence. It was on the basis of these observations that the prior evaluations recommended the petitioner's placement in a secure, supervised setting where his behavior could be modified. The court-ordered evaluation recommended that the petitioner be placed in a vocational rehabilitation program where his deficiencies in social learning and academic achievement could be corrected, but noted reservations as to the ability of such a program to provide adequate security.

We recognize, as the State asserts, that none of the psychological evaluations before the circuit court made a

finding of mental illness in the petitioner's case. Indeed, the psychologists and psychiatrists who examined the petitioner cautiously avoided diagnosing the petitioner's behavioral problems as being the result of mental illness, attributing his delinquent behavior instead to an antisocial personality disorder which was not amenable to treatment in the setting of a conventional mental health facility. The medical reports show, however, that the petitioner is a disturbed child prone toward socially unacceptable behavior which he is unable to control.

We are of the opinion that the distinction between a troubled child who exhibits dangerous antisocial behavior which he is unable to control and a child who displays a "traditional" mental illness may be too subtle to be traced definitively by the judicial mind. We hold that a child who is mentally incapable of conforming his conduct to prescribed legal norms and who cannot restrain himself from committing proscribed antisocial acts, thereby presenting a danger to himself or to others, comes within the definition of "mental illness" and shall to be treated accordingly. The petitioner here may fall within that category. While earlier evaluations indicated that in certain situations the petitioner is unable to control his behavior, the court-ordered evaluation conducted prior to the dispositional hearing was somewhat more favorable in its diagnosis. While the circuit court made a finding that the petitioner presented a danger to himself and to others, it should have posited that finding in mental incapacity. We think that where a question is raised as to the mental capacity of a child adjudged delinquent, the juvenile court is obliged to develop the matter and to state its findings upon the record so that the conclusion of the juvenile court as to the child's capacity may properly be reviewed in a subsequent proceeding. The court's investigation should involve multi-professional evaluations by those connected or employed by such agencies as the Department of Health, the County Board of Education, the Department of Welfare and the Department of Corrections,who are able to evaluate the child's abilities and disabilities.

## II.

The petitioner also contends that his continued incarceration at the Industrial School after the Superintendent recommended that he be discharged and returned to the custody of the circuit court for placement in another facility was unlawful. The petitioner contends that upon receipt of the Superintendent's recommendation, the circuit court was required to discharge him from incarceration and receive him into custody pursuant to W. Va. Code § 49-5-13(b)(5).

W. Va. Code § 49-5-13(b)(5) reads in material part:

> Commitments shall not exceed the maximum term for which an adult could have been sentenced for the same offense, *with discretion as to discharge to rest with the director of the institution, who may release the child and return him to the court for disposition;* .... (Emphasis added.)

In *State ex rel. Washington v. Taylor*, ___ W.Va. ___, 273 S.E.2d 84 (1980), we held that under this provision a circuit court did not have the authority to decline to receive a child whose release has been recommended by the director of the institution to which the child had been committed. In that case the Superintendent of the Industrial School had concluded that the child had successfully completed the institution's rehabilitation program and that his continued progress would not be served by further incarceration. The circuit court refused to accept custody, however, until the child had completed the minimum term of incarceration imposed at the dispositional hearing. We concluded that permitting the court to override the discretion of the institution's director and to require the child to remain incarcerated for a miminum term would undermine the institution's rehabilitation program.

Here, the Superintendent's recommendation that the petitioner be discharged from his custody was motivated by his conclusion that the Industrial School's treatment program was inadequate to achieve the petitioner's

rehabilitation. In his letters to the circuit court, the Superintendent explained that the Industrial School's program was designed to use long term reinforcement, in the form of earning time towards early release, to achieve rehabilitation of the residents and that this treatment, when combined with the privileges available in a maximum security facility, was insufficient to motivate the petitioner. The Superintendent stated that the petitioner was suffering from a disorder that the facility was unable to treat; that the petitioner was interfering with the rehabilitation of other residents; that the petitioner was influenced by other residents of the institution to engage in unacceptable behavior; and that the petitioner's behavior had grown progressively worse even though he had been placed in the school's most intensive treatment unit. Superintendent Trent stated that further incarceration at the school or at any other similar facility with limited resources would be detrimental to the petitioner's health and well-being and recommended the petitioner's immediate placement in one of several out-of-state facilities which might be better able to meet the petitioner's needs.

The State contends that since the Superintendent's recommendation that the petitioner be discharged from his custody was not based on any determination that the petitioner had successfully completed the institution's treatment program, but rather on his conclusion that the petitioner had failed to respond to the treatment offered at the school, *Washington* is not applicable here. The State would have us hold that the Superintendent's recommendations are entitled to credence only when they are based on the conclusion that the child should be returned to the community. We do not think the discretion vested by W. Va. Code § 49-5-13(b)(5) in the director of a juvenile correctional institution is so limited.

The Legislature obviously bestowed upon the director of a correctional facility the discretion to recommend the return of an incarcerated child to the custody of the committing court in recognition of the fact that the director is the person best able to judge the progress of

the child within the institution's rehabilitative program. If, after observing and evaluating the child's involvement in the institution's program, the director concludes that continued incarceration is not in the child's best interest, the circuit court is obliged to give credence to the director's professional judgment. It is irrelevant for purposes of W. Va.Code § 49-5-13(b)(5) whether the director's recommendation that custody be transferred is based on the success or failure of the institution's program to accomplish the rehabilitation of the child. Rather, the paramount consideration is the negative effect continued incarceration is likely to have either upon the child or upon the institution's effective treatment of other children. Consequently, where the director of a correctional institution to which a delinquent child has been committed determines that continued incarceration will not accomplish the rehabilitation of the child and recommends that the child be returned to the custody of the committing court for placement in another facility better suited to meet the needs of the child, the court to which such recommendation is directed is required by W. Va. Code § 49-5-13(b)(5) to defer to the discretion of the director and to take steps to implement an appropriate alternative disposition.

The State argues, however, that even if the circuit court was required by the statute to take custody of the petitioner, there is no basis for granting the habeas corpus relief sought by the petitioner because the Superintendent did not recommend the immediate release of the child, but only requested that the committing court take custody of the child and locate an alternative treatment facility. The State asserts that the circuit court did in fact accept custody of the petitioner and that the Superintendent voluntarily retained the petitioner at the Industrial School until a suitable treatment facility could be found.

The evidence shows that on August 19, 1981 Superintendent Trent requested the *immediate* transfer of the petitioner to an alternative treatment facility. The circuit

court promptly requested the Department of Welfare to implement the recommendation. There is nothing on the record to indicate any action on the part of the court or the Department of Welfare for the next several months to secure the petitioner's placement in a more suitable facility. On November 5, 1981, the Superintendent informed the circuit court that he had received no response to his request. At the end of November the social service worker conducting the petitioner's case stated to the child's counsel that she was attempting to place the petitioner at the Davis center and had not considered out-of-state placement. On December 1, 1981, the Superintendent again contacted the circuit court requesting that it take custody of the child and named several out-of-state facilities that might be able to help the petitioner. It was not until the day after the petition was filed in this case that the Department of Welfare informed the circuit court that it was attempting to place the petitioner in one of two out-of-state facilities.

We do not think these facts support the State's contentions. Although the circuit judge promptly ordered the Department of Welfare to locate an appropriate alternative facility in which to place the petitioner, the evidence shows that little, if any, action was taken by the Department of Welfare to implement the Superintendent's recommendation until approximately four months later after the petition was filed in this case. There is no evidence that the circuit court attempted to prod the Department of Welfare into action. Nor is there any indication that the Superintendent was notified that alternative placement was being sought for the petitioner. Indeed, the Superintendent's letters of November 5 and December 1, 1981, indicate that no response at all had been made to his original recommendation that custody of the petitioner be returned to the circuit court, much less a notification of compliance therewith.

We think it is clear from these facts that the Superintendent retained custody of the petitioner, not as an accommodation to the circuit court pending the location of an alternate facility, but rather because the circuit

court did not order the petitioner transferred from the custody of the Department of Corrections. The circuit court must act affirmatively and in good faith to secure proper custody of a juvenile whom the director of a correctional institution has determined to be unamenable to treatment by further incarceration. As the record here shows no such effort by the circuit court with regard to the petitioner, we must conclude that the court has not yet complied with the Superintendent's request that the petitioner be returned to the custody of the court, and we award the writ of habeas corpus on this ground.

## III.

The petitioner's final prayer is that a writ of mandamus issue to compel the circuit court to afford the petitioner appropriate treatment which will promote his rehabilitation. We think there is little question that a child adjudged delinquent and committed to the custody of the State has both a constitutional and a statutory right to treatment. We have noted on numerous occasions that the purpose of our juvenile justice system is to provide for the rehabilitation of delinquent children. *State ex rel. D.D.H. v. Dostert, supra; State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977). The rehabilitative goal of the juvenile justice system is embodied in the statement of purpose contained in W. Va. Code § 49-1-1(a) in (1981 Cum. Supp.):

> The purpose of this chapter is to provide a comprehensive system of child welfare throughout the State which will assure to each child such care and guidance, preferably in his or her home, and will serve the spiritual, emotional, mental and physical welfare of the child; preserve and strengthen the child's family ties whenever possible with recognition of the fundamental rights or parenthood and with recognition of the State's responsibility to assist the family in providing necessary education and training and to reduce the rate of juvenile delinquency and to provide a system for the rehabilitation or detention of juvenile delinquents and the protection of the

welfare of the general public. In pursuit of these goals it is the intention of the legislature to provide for removing the child from the custody of parents only when the child's welfare or the safety and protection of the public cannot be adequately safeguarded without removal; and, when the child has to be removed from his or her family, to secure for the child custody, care and discipline consistent with the child's best interests and other goals herein set out.

The child welfare law clearly contemplates that the rehabilitation of delinquent children shall be accomplished by a program of individualized care and treatment directed towards the ultimate goal of reintegrating such children into society so that they no longer pose a threat to themselves or to the public.

Moreover, since the State has defined its interest in taking custody of delinquent children as rehabilitation, due process requires that the nature of the child's custody bear a relation to that rehabilitative purpose. *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

The basis for commitment–to rehabilitate and re-establish the juvenile in society–is clearly grounded in a *parens patriae* rationale. Thus, under the *parens patriae* theory, the juvenile must be given treatment lest the involuntary commitment amount to an arbitrary exercise of governmental power proscribed by the due process clause.

*Morales v. Turman*, 383 F.Supp. 53, 71 (E.D. Tex. 1974); *rev'd on other grds.*, 535 F.2d 864 (5th Cir. 1976). *See also Morgan v. Sproat*, 432 F.Supp. 130 (S.D. Miss. 1977); *Pena v. New York State Division of Youth*, 419 F.Supp. 203 (S.D. N.Y. 1976); *Nelson v. Heyne*, 355 F.Supp.. 451 (N.D. Ind. 1972), *aff'd* 491 F.2d 352 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Martarella v. Kelley*, 349 F.Supp. 575 (S.D. N.Y. 1972); *Inmates of Boy's Training School v. Affleck*, 346 F.Supp. 1354 (D.R.I 1972). This Court recognized the juvenile's constitutional right to treatment in *State ex rel. K.W. v. Werner, supra.*

To accomplish the rehabilitative goal of the juvenile justice system, all officers and employees of the State charged with implementing the provisions of the juvenile law are required to act in the best interests of the child and the public in establishing an individualized program of treatment which is directed toward the needs of the child and likely to result in the development of the child into a productive member of society.

> Without a program of individualized treatment the result may be that the juveniles will not be rehabilitated, but warehoused, and that at the termination of detention they will likely be incapable of taking their proper places in free society; their interests and those of the state ... thereby being defeated.

*Nelson v. Heyne,* 491 F.2d at 360.

The child welfare statutes clearly set forth the officers and agencies upon whom this obligation falls. The Department of Welfare is required to develop standards of child care and to advise, cooperate with, assist and supervise all child welfare agencies which care for delinquent children, W. Va. Code § 49-2-3 (1980 Replacement Vol.); to provide care, support and protective services for children in need of public services, W. Va. Code § 49-2-16 (1980 Replacement Vol.); to investigate alternative dispositions appropriate for delinquent children upon request of the court, W. Va. Code § 49-5-13(a) (1980 Replacement Vol.); to investigate the child's background and furnish information and assistance to the juvenile court, W. Va. Code § 49-5-15 (1980 Replacement Vol.); to establish rules and regulations governing juvenile correctional, detention and other facilities, W. Va. Code § 49-5-16a (1980 Replacement Vol.); to encourage alternatives within the juvenile justice system, W. Va. Code § 49-5B-4 (a) (1980 Replacement Vol.); and to provide an individualized program of treatment for each child adjudged delinquent. W. Va. Code § 49-5B-4(b). The Department of Health is required to cooperate with and assist the Department of Welfare in its formulation of standards for child care and services for

children, W. Va. Code § 49-2-3, and to conduct a physical and mental examination of wards of the court upon request of the court. W. Va. Code § 49-5-4 (1980 Replacement Vol.). The Commissioner of Corrections is required, upon request of the court, to accept custody of delinquent children, to have diagnostic and medical tests conducted and to submit a report of the results of such tests to the juvenile court, W. Va. Code § 49-5-13a (1980 Replacement Vol.), and to formulate rules and regulations governing the operation of juvenile correctional institutions. W. Va. Code § 49-5-16a. The juvenile court is required to protect wards of the court, W. Va. Code § 49-5-4; to hear all witnesses who might shed light upon the proper disposition of the child and give precedence to the least restrictive alternative disposition consistent with the best interests of the child and the public, W. Va. Code § 49-5-13(b); and to exercise continuing jurisdiction over children under the age of eighteen. W. Va. Code § 49-5-2 (1980 Replacement Vol.).

The statutory provisions clearly anticipate a cooperative effort on the part of the named officers and agencies to develop a comprehensive program of individualized treatment for juvenile offenders. This Court has recognized this purpose of the child welfare law. In *State ex rel. D.D.H. v. Dostert, supra,* we set forth in detail the respective roles of the court, the probation officer or welfare worker, the child and the child's counsel at the dispositional stage. In addition to those responsibilities specifically enumerated by statute, we concluded that the juvenile court is required to review intelligently the child's social history so that an individualized treatment plan may be devised and to order incarceration only when it appears that the child is dangerous or must be restrained in order to prevent flight, and the Department of Welfare is required to attempt to find a suitable alternative to incarceration. Counsel for the child is also required to participate actively at the dispositional stage and has a duty to make an independent investigation of the child's background; to inform himself in detail of the facilities both within and without the State which are

suited to the child's needs and able to treat him; to take the initial steps to secure tentative acceptance of the child by appropriate facilities; and to advise the juvenile court of the terms and conditions under which such facilities will accept the child. The child's role in the process is to cooperate in the treatment program geared toward his rehabilitation and re-entry into society.

Of course, the respective obligations of these officers and agencies is most often discussed with respect to the disposition of the juvenile in the first instance. Certainly at that point those who are charged with effecting the purposes of the juvenile law are expected to act in concert to design a treatment program which can be reasonably predicted to facilitate the rehabilitation of the child and serve the interest of society. This responsibility does not end with the juvenile court's determination of the proper disposition. "Treatment and rehabilitation represent . . . a continuum measured by the period of time the juvenile offender remains in the state's custody." *Nelson v. Heyne,* 355 F.Supp. at 459. Those into whose care the child is placed have a responsibility to monitor and evaluate the progress of the child. If it becomes apparent that the child is unable to respond to the rehabilitative model of the caretaker institution, it is the responsibility of the director of the institution to report the failure of the ordered treatment to effect the rehabilitation of the child to the committing juvenile court and to recommend alternative treatment. The court should then require an immediate reevaluation of the alternatives appropriate for treatment of the juvenile, involving the appropriate agencies and officials in the process, and order the child placed in an environment better suited to his rehabilitative needs. As there does not appear to have been any affirmative effort on the part of the circuit court and the Department of Welfare to evolve, with the cooperation of other state agencies, a comprehensive individualized program of treatment with respect to the petitioner in the face of the Superintendent's recommendations, we grant the writ of mandamus prayed for and order the circuit court to supervise the development of such a program.

As a final matter, we note that juvenile courts and the Department of Welfare are not limited by statute to relying solely upon their own resources to develop individualized treatment programs for juvenile offenders. The Department of Welfare has the express authority to enter into cooperative ventures with private or State agencies in order to establish and implement rehabilitative alternatives for juveniles. W. Va. Code § 49-5B-4(c). Thus, the Department of Welfare is at liberty to call upon the expertise of the Department of Health, the Department of Education and county boards of education, as well as that of private agencies and organizations, to design and put into operation individualized treatment programs that will address the problems and needs of delinquent children, thereby fulfilling the interests of society. The juvenile courts and state agencies involved in the treatment process should draw upon these valuable resources to effect the rehabilitative purposes of the juvenile justice system.

For the reasons stated in this opinion, we award the writ of habeas corpus prayed for and order the petitioner discharged from the custody of the Superintendent of the Industrial School for Boys and remanded to the custody of the Circuit Court of Ohio County. A writ of mandamus will issue to compel the circuit court, in cooperation with the Department of Welfare and other agencies, to secure immediately the petitioner's placement in an appropriate juvenile rehabilitation and treatment facility whose program is designed to meet the petitioner's individual needs, in accordance with the priniciples enunciated herein.

*Writs awarded.*